[No. 27550. Department Two. February 19, 1940.]

E. Van Nostern, *Respondent,* v. Richey and Gilbert Company *et al., Appellants.*

P. P. Puyear, *Respondent,* v. Richey and Gilbert Company *et al., Appellants.*[1]

[1]Reported in 99 P. (2d) 608.

664

*Cheney & Hutcheson, John Gavin,* and *J. H. Immel,* for appellants.

*Snively & Bounds* and *Owen Clarke,* for respondents.

GERAGHTY, J.—As the issues of law and fact in the two cases involved on this appeal were substantially the same, they were consolidated for trial in the court below. In each case, recovery was sought from the two corporate defendants for loss sustained by the plaintiff as the result of the negligent management of a warehouse in which he had stored a quantity of onions.

The plaintiff Puyear, in the summer of 1936, grew and harvested a crop of onions on land owned by the plaintiff Van Nostern, on a crop-sharing arrangement, by the terms of which Van Nostern was to receive one-third of the crop as rental. The onions were pulled and topped in the early part of October and were allowed to dry for a few days, then field-sorted and sacked, and, after two weeks, stored in a warehouse at Toppenish owned by the Richey and Gilbert Company; 57 tons were stored to the credit of Van Nostern and 147 tons to the credit of Puyear. Warehouse receipts were issued to each of the plaintiffs. These receipts were on the printed forms issued by Richey and Gilbert and were signed, in the name of that company, by H. A. Kenyon, bookkeeper for defendant Kurtz and Dorsey, Inc. Each of the plaintiffs countersigned his receipt as owner of the stored produce.

In each of the complaints, it is alleged that, through the carelessness and negligence of the defendants in failing to provide sufficient heating and adequate ventilation in the storage room, the plaintiff's onions stored therein froze and broke down and were rendered useless and valueless for commercial purposes, result-

ing in their total loss. Plaintiff Puyear, in a second cause of action, sought recovery for the alleged conversion of 2981 sacks, containing the onions delivered to the defendants for storage. The jury returned a verdict in favor of each of the plaintiffs. Van Nostern was awarded $1,070, and Puyear $2,925 for the loss of his onions and $74.52 for the conversion of his sacks. After the denial of motions for judgment notwithstanding the verdicts or, in the alternative, for new trial, separate judgments were entered on the verdicts in favor of the respective plaintiffs and against both defendants, who have separately appealed.

It is urged, first, that the evidence was not sufficient as against either of the appellants, to make a case for the jury, and that this is especially true as to the appellant Kurtz and Dorsey, Inc.

We pass for the present the question of the liability of Kurtz and Dorsey to consider the basic question whether the respondents' evidence was sufficient to make a case for the jury on the issue of the negligent management of the warehouse in which their onions were stored. The jury, undoubtedly, from the evidence, could have found that the onions, when stored, were in good condition, and that, while in storage, they sustained damage. But these facts, standing alone, would not be sufficient to charge the appellants with liability. The onions were a perishable commodity, and the rule is that, where perishable goods have sustained damage in storage, negligence cannot be presumed from the mere fact of damage, but the negligent acts or omissions causing the damage must be affirmatively proved. *Patterson v. Wenatchee Canning Co.*, 53 Wash. 155, 101 Pac. 721. The trial court applied this rule in its instructions to the jury. Instruction No. 4 reads:

"You are instructed that where perishable goods are damaged in storage, negligence will not be presumed from the mere fact of the damage, but the burden is upon the plaintiffs to establish, by a fair preponderance of the evidence, that the onions were in good condition at the time they were received by the defendants, and also the negligent acts or omissions, if any, of the defendants causing the alleged damage."

This admonition was repeated in instructions Nos. 5 and 6.

We have, then, to consider whether there was sufficient evidence, or inference from evidence, to warrant the jury in finding that, in the management of the warehouse, the appellants were negligent in the performance of the duty owing the respondents in respect to the stored onions.

The respondent Puyear testified that, in the early part of February, after a period of extremely cold weather, he went to the warehouse and entered the large room in which his onions were stored. He saw where frost had come in around the door near his onions. Near the door was a sack which had been opened by someone. He took five onions out and cut them open and found them frosted on the outside layer, and that there were thin sheets of ice between the layers. A week later, on returning to the warehouse after the weather had moderated, there was no frost, but he found the onions had started to decay. They were sorted twice in an effort to salvage them. Afterwards, they were loaded into cars and shipped by Kurtz and Dorsey, Inc. Puyear testified that all he ever got from Kurtz and Dorsey was a statement of account, and that Mr. Kurtz advised him to see Elon Gilbert of Richey and Gilbert Company, who might throw off the storage charge, amounting to $406.80.

The respondent Van Nostern testified that, March 1st, he sold a quantity of the onions he had in storage

to Mr. Dorsey of Kurtz and Dorsey, Inc., for $38 a ton, that being the market price at the time. The purchase was made subject to inspection by the buyer. A few days after the contract was made, Mr. Dorsey informed him that Kurtz and Dorsey, Inc., could not take the onions because they were damaged, and told him to go and look at them. He did so and found them badly damaged and wet. There was moisture on the roof and ceiling of the storage room.

"I couldn't market them. I only tried to sell them to those fellows. They shipped them for me and rendered a statement to me  .  .  .  that I was $143.42 in the hole. I never received any other report or statement."

T. L. Cook, who had grown and stored onions for a number of years, testified that, during the season of 1936-37, he had stored about 150 tons of onions for someone else in the Richey and Gilbert warehouse. He was in the warehouse in the middle of February. His onions were stored in the same room as Puyear's. When he looked at them, they were in good shape, but wet. The ceiling was wet, and the water was dripping down on the sacks in one place and, in another, "the water sat on the walls." This moisture came from the evaporation of the onions. The onions he had stored developed decay and sour skin. He testified that the room in which the onions were stored was not properly ventilated. He noticed a coal stove, and two ventilating fans were going. He testified that the cause of sour skin was excessive moisture, which comes from poor ventilation; that the normal shrinkage of onions in storage is ten to twenty per cent, due to evaporation. In the Richey and Gilbert warehouse, potatoes were stored in the basement under the onions. This was bad practice, he said, because of the necessity of keeping moisture out of the onions, and potatoes throw

off moisture. He said, however, that nearly all the big warehouses in Yakima valley stored potatoes in their basements.

Another onion raiser, Mr. Ernest Rowe, testified that he had stored a large quantity of onions in the Richey and Gilbert warehouse in the winter of 1936-37. They were stored in the same room with Puyear's and Van Nostern's. He looked at three or four of the Puyear onions in one sack and found frost on all of them, the top of the sack. He saw one fan in the storage room, but did not see it working. He saw one stove there with a fire in it.

H. M. Asbury, engaged in the produce business, testified that he examined the Puyear and Van Nostern onions in February with the intention of buying them if they were all right. He found frost on them, but they had not begun to break down; when onions have been frosted, they begin to break down when they thaw. He did not buy them and told his manager not to buy them at any price. He saw some fans in the storage room, but they were not working. He noticed moisture in the room. There was one stove, but he did not know whether it was lit or not. He testified that moisture and freezing would cause onions to rot; they would not keep if they were damp when put in storage.

The testimony of another buyer, Mr. Clark, was of similar import to that of Asbury in respect to the condition of the onions.

A former banker testified that Mr. Dorsey, assuming he was interested, as a creditor of Puyear, in having the onions sold, called him on the telephone and said the onions were in bad condition and some were frosted.

C. F. Dorsey of the firm of Kurtz and Dorsey, Inc., testified that there was nothing wrong with the Richey

and Gilbert warehouse. It was as good as could be had anywhere in the valley. "We are all the time trying to improve it. . . . Onions broke down that season in every warehouse in the valley." Coke stoves, called salamanders, were used in the storage room when needed. They were used around the big doors when cars were being loaded. Referring to statements rendered the respondents after their onions were disposed of by his corporation, he said the statements were on account of the credits his company received back on the onions and of the balances due them.

There was other testimony produced by the appellants tending to show that there were two large ventilators and five or six large fans in the warehouse, and that there was ample ventilation; that the temperature in the warehouse was kept between 32 and 36 degrees, and that sour skin would develop from a condition existing at the time the onions are harvested.

It was for the jury to weigh the conflicting evidence on the issue of negligence, and we cannot say that it preponderated against the verdicts.

■ We now consider the question of the relation of the appellant Kurtz and Dorsey, Inc., to the storage contract.

This appellant contends that it was merely the agent of the Richey and Gilbert Company for the solicitation of storage, and that respondents knew and were informed of this relation at the time the onions were received at the warehouse. Mr. Dorsey testified that the warehouse belonged to Richey and Gilbert Company, which paid the employees operating it and took care of any produce coming in or going out of it, and received the net storage. Kurtz and Dorsey, Inc., received from Richey and Gilbert fifty cents a ton for onions and twenty-five cents a ton for anything else stored in the warehouse. His company was employed

to keep the records and collect the storage as part of its duties. It was engaged in the business of buying and shipping produce, but Richey and Gilbert Company was not in any way interested in, and had nothing to do with, the vegetable business conducted by it. When produce was received for storage, a warehouse receipt or ticket was issued. Kurtz and Dorsey, Inc., or its bookkeeper executed warehouse receipts for Richey and Gilbert Company and collected the storage as agent for that company and transmitted the money collected to it.

The following is a copy of the receipt issued to respondent Puyear:

"DUPLICATE     WAREHOUSE RECEIPT     No. 22
Not Negotiable
RICHEY & GILBERT Co.
Toppenish Wash. 10-14-1936.
RECEIVED FROM P. P. Puyear, for storage in the warehouse of RICHEY & GILBERT Co. at Toppenish, Wash., at the owner's risk of fire and unavoidable damage, the following:

| No. Packages | Weight | Description | Location in Warehouse |
|---|---|---|---|
| 52981 | 295860 | Onions | House 2 |

WEIGHT SUBJECT TO NATURAL SHRINKAGE

"The above property will be delivered only upon the surrender of this receipt properly endorsed and all charges paid. Partial deliveries must be noted on back of this receipt.

"'All right of subrogation or recovery against the railroad company, upon whose land this warehouse is situated, or by whom sidetrack facilities are furnished, for loss or damage by fire, injury or otherwise, is hereby specifically waived.'

Handling charges................per ton. Advances................
Storage charges, $2.75 per ton per season.
RICHEY & GILBERT Co.
By H. A. Kenyon.

"Season Storage on the produce covered by this receipt is due March 1st, 193......., and if not paid on or before that date, Richey & Gilbert Company are hereby authorized to sell, without written notice to the owner, sufficient amount of said produce to cover the said storage charges, also sorting, sacks and other necessary expense of marketing the quantity sold. Should said produce not bring sufficient to cover said charges and expenses, the owner hereby agrees to pay any balance. This agreement is not intended to waive or supersede the warehouseman's lien secured by law.

Signed, P. P. Puyear<br>Owner.<br>.................................................................Mortgagee."

Van Nostern's receipt was on the same form and executed in the same manner. The "H. A. Kenyon" who signed the receipt on behalf of the Richey and Gilbert Company was bookkeeper for Kurtz and Dorsey, Inc. While Van Nostern said he did business with no one but Kurtz and Dorsey, Inc., he also testified that Dorsey told him his corporation was running the warehouse on a percentage basis with Richey and Gilbert; and that, when he called Kurtz's attention to water dripping from the ceiling, Kurtz said, "We will make it good." Puyear testified that Dorsey solicited the storage of his onions and, as an inducement, offered a reduced rate. All this was consistent with the relation of Kurtz and Dorsey as agent for Richey and Gilbert, owner of the warehouse.

The respondents rely on the rule announced in *Downey v. Savage,* 72 Wash. 164, 129 Pac. 1096, that,

"Irrespective of what is the true relation as between themselves, persons can so hold themselves out as partners in a particular business and thereby induce others to deal with them as such and give credit on the faith of such a relation, that as to such third persons the relation will be held to exist. The rule that fixes such a liability, when in reality the relation does

not exist, is a familiar illustration of the general principle of estoppel when acted upon by another."

This rule, however, is not applicable here, where, as shown by the warehouse receipts, there was a full disclosure of the fact that Richey and Gilbert were the warehousemen with whom the onions were placed in storage.

In the statements of account to the respondents, Kurtz and Dorsey included the charge for storage, but part of the duty they owed to Richey and Gilbert was the collection of storage charges. So, too, the solicitation of the storage by Dorsey was consistent with the relation of agent. From our examination of the record, we are of the opinion that the trial court should have held, as a matter of law, that the relation of Kurtz and Dorsey was one of agency, and should have granted its motion for judgment notwithstanding the verdict and dismissed it from the action.

It is next contended that the respondents did not introduce any substantial evidence with respect to the market value of the onions at the time of the termination of the bailment, had there been no negligence, and the market value at that time, in their then condition.

This contention is without merit. It is true that the market value of onions declined during the months of March and April, but the evidence shows that the market value of onions in February was between $35 and $40 a ton. There is in evidence the written contract made by Kurtz and Dorsey for the purchase of Van Nostern's onions at $38 a ton. This contract was made subject to inspection by the purchaser. Dorsey testified that, a few days after this contract was made, he examined the onions and refused to accept them, because they were wet and full of rot, sour skin, and

decay. Puyear's onions were in the same condition. Of course, they were not then withdrawn from storage and sold, because no one would buy them. Later, having been sorted and re-sorted, they were taken over and disposed of by the appellants.

The proper rule, we think, applicable to the facts here is stated in *Church Mfg. Co. v. American Security Bank*, 130 Wash. 575, 228 Pac. 518. The only question in that case was in respect to the measure of damages to be awarded to a bailor for losses sustained by reason of his apples being frozen while in storage in the bailee's warehouse. The court said:

"The rule by which to measure damages for injury to personal property which has not been entirely destroyed is its fair market value immediately before and immediately after the injury. *Alexander v. Barnes Amusement Co.*, 105 Wash. 346, 177 Pac. 786; *Polle's Seed & Imp. Co. v. Rudene*, 117 Wash. 150, 200 Pac. 1104. The fair market value of the appellants' apples before the injury may be taken to have been established as $996.25, but there is no testimony in the case of their fair market value *immediately* after the injury. Under the peculiar facts in this case, *immediately* cannot be given its strict meaning, for the extent of the injury could not have been discovered immediately. It was necessary to take all the apples and repack them in order to determine how many were unfit for use, and until that time it was impossible to establish the extent of the injury, so that the measure of damages here must be the difference between the fair market value immediately before and immediately after the extent of the injury had been determined."

The trial court embodied this rule in its instruction No. 18, which, in part, reads as follows:

"If your verdict shall be for the plaintiffs, the measure of damage will be for the difference between the fair cash market value of the onions in the condition they were in at the time the extent of the injury was ascertained and what would have been the

fair cash market value of the same at said time if they had not been damaged, if they were in fact damaged, not exceeding the amount asked for in the complaints."

There is evidence in the record to the effect that onions, under normal conditions, shrink in weight from ten to twenty per cent. Allowing for this shrinkage, the damages awarded the respondents would approximate about $25 a ton, which, under the evidence, was well within the market value at the time the extent of the damage to the onions was determined.

In connection with the amount of damages awarded, the appellants contend that the cost of storage should have been allowed as an offset in mitigation of the damages. The appellants' answers to the complaints consisted of general denials, and no affirmative claim for storage charges was made by way of counterclaim or cross-complaint. In instruction No. 18, quoted above, the court instructed the jury on the measure of damages. The only objection made by the appellants to this instruction was with reference to the time at which the damages were to be computed.

The warehouse receipts contained a provision authorizing the Richey and Gilbert Company, in the event storage charges were not paid by March 1st, to sell a sufficient amount of the produce to cover storage charges, as well as charges for sorting, sacks, and other necessary expenses of marketing the quantity sold, and provided that, should the produce not bring sufficient to cover charges and expenses, the owner was to pay the balance. By virtue of this provision of the contract of storage, Richey and Gilbert acquired the right to recover from respondents any sum owing for storage and other charges after application of the receipts from the sale of the onions. If there was any amount due from the respondents to Richey and Gilbert for storage or other charges, that company could have asserted its

right in the action by way of counterclaim or cross-complaint. In the absence of any such claim, it was not entitled to have the charges deducted from the damages awarded by the jury.

Error is assigned upon certain instructions given by the court and the refusal of the court to give certain instructions requested by the appellants. An examination of the court's instructions as a whole satisfies us that they fully and adequately covered the issues in the case.

■ It is contended that the evidence was insufficient to establish the value of the sacks for which recovery was sought in Puyear's second cause of action.

Puyear testified that the sacks, when delivered to the warehouse, were second-hand wheat sacks, in good condition, and of the market value of five cents each. The witness Berman testified that the sacks would be worth three cents each after being in storage. The jury's award was at the rate of two and a half cents a sack. We think the appellants' contention without merit.

■ It is also contended that instruction given by the court in relation to the storage of potatoes in the basement of the warehouse, under the onions, was improper, since such storage was not alleged as one of the acts of negligence in the complaints.

There was, however, an allegation of faulty ventilation, and there is evidence in the record to the effect that the storage of potatoes in the basement tended to increase the amount of moisture in the room above, making the problem of ventilation more difficult. There was no error in the instruction.

After judgment, the respondents filed separate cost bills in each of the two cases and also in the consolidated case. The appellants moved to strike these cost bills or, in the alternative, to have the costs retaxed.

The court struck the cost bill in the consolidated case, but approved the cost bills as filed in the separate cases.

In each of the cost bills, there is included the statutory appearance fee and fee for entering judgment; the sheriff's fees, a statutory attorney's fee, and a jury fee. The actions were instituted separately, separate demands for a jury were made, and separate judgments were entered on the verdicts. As these fees were paid by the respondents, we think they should be allowed in each case, as well as the statutory attorney's fee.

There was also included in the cost bills $285 in the Van Nostern case and $295 in the Puyear case, for witness fees and mileage. The witnesses were the same in both cases, except that the witness Berman testified for Puyear only, in relation to the value of the sacks sued for in his second cause of action; and the further exception that Puyear was allowed $22 for testifying in the Van Nostern case and Van Nostern was allowed a like sum for testifying in the Puyear case.

In the circumstances as disclosed by the record, we conceive that it would be unjust to allow a duplication of the fees and mileage. With the exception of the claim for sacks in Puyear's case, the cases involved the same state of facts, which were to be resolved by the jury on the testimony of the same witnesses; indeed, they were all called and sworn to testify as witnesses for the respondents jointly.

We are also of the opinion that witness fees and mileage should not be allowed to the respondents, as each was called as a witness for himself as well as for the other plaintiff. The trial court is directed to retax the costs accordingly.

What is said here has relation, of course, to the costs taxable below, in favor of the respondents, against the

Richey and Gilbert Company. Since the judgment against Kurtz and Dorsey, Inc., is to be reversed, that company will be entitled to have its proper costs below taxed against the respondents.

The appellant Kurtz and Dorsey, Inc., in addition to its other statutory costs, shall recover from the respondents, as costs, in this court, one-half of the cost of the transcript, statement of facts, abstract, and briefs, as well as one-half of any premium paid on account of the costs and supersedeas bond.

The judgment against Richey and Gilbert is affirmed; the judgment against Kurtz and Dorsey, Inc., is reversed, with direction that the actions against it be dismissed.

BLAKE, C. J., STEINERT, and JEFFERS, JJ., concur.

BEALS, J. (dissenting in part)—I dissent from the opinion of the majority opinion in so far as the judgment against Kurtz & Dorsey, Inc., is reversed. I concur in the affirmance of the judgment against Richey and Gilbert Co., save that I think, in view of the modification of the judgment as to costs, no costs should be allowed in this court.