**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JUNE 15, 2023

_González C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 15, 2023

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| GABRIEL PORTUGAL, BRANDON PAUL MORALES, JOSE TRINIDAD CORRAL, and LEAGUE OF UNITED LATIN AMERICAN CITIZENS, | No. 100999-2 |
| Respondents, | |
| v. | En Banc |
| FRANKLIN COUNTY, a Washington municipal entity, CLINT DIDIER, RODNEY J. MULLEN, LOWELL B. PECK, in their official capacities as members of the Franklin County Board of Commissioners, | Filed: June 15, 2023 |
| Defendants, | |
| JAMES GIMENEZ, | |
| Appellant. | |

YU, J. — This case presents matters of first impression concerning the interpretation and facial validity of the Washington voting rights act of 2018

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(WVRA), ch. 29A.92 RCW.[1]  As detailed below, the WVRA protects the rights of Washington voters in local elections.  In this case, three Latino[2] voters from Franklin County alleged that the county's system for electing its board of commissioners violated the WVRA by "dilut[ing] the votes of Latino/a voters." Clerk's Papers (CP) at 1.  The plaintiffs (respondents on appeal) ultimately settled with defendants Franklin County and the Franklin County Board of Commissioners.  The defendants are not participants on appeal.  We are not asked to review the merits of the plaintiffs' claim or the parties' settlement agreement.

The issues on appeal were raised by James Gimenez, a Franklin County voter who was allowed to intervene by the trial court.  Immediately after his motion to intervene was granted, Gimenez moved to dismiss the plaintiffs' claim, arguing that the plaintiffs do not have standing and that the WVRA is facially invalid.  The trial court denied Gimenez's motion to dismiss, and he was not an active participant in the case thereafter.  After the trial court entered a final order approving the parties' settlement, Gimenez appealed directly to this court.

Gimenez's arguments are all based on his view that the WVRA protects some Washington voters but excludes others.  The WVRA's protections apply to

---

[1] The legislature amended the WVRA while this appeal was pending, effective January 1, 2024.  *See* LAWS OF 2023, ch. 56, § 14.  This opinion does not address those amendments.

[2] When referring to the race or ethnicity of specific individuals, this opinion uses the terminology used by that individual.  When quoting from another source, this opinion uses the terminology from the source material.  Otherwise, this opinion uses gender-neutral terminology.

*Portugal et al. v. Franklin County et al.*, No. 100999-2

"a class of voters who are members of a race, color, or language minority group."[3]

RCW 29A.92.010(5). Gimenez interprets this language to mean that the WVRA protects only members of "'race <u>minority groups</u>,' 'color <u>minority groups</u>,' or 'language minority group[s].'" Br. of Appellant at 2 (underlining added) (alteration in original). Based on this interpretation, Gimenez argues that the plaintiffs do not have standing because the WVRA does not protect Latinx voters from Franklin County as a matter of law. Gimenez also argues that the WVRA has been repealed by implication and is facially unconstitutional because it requires local governments to implement electoral systems that favor protected voters and disfavor others on the basis of race.

Gimenez's arguments cannot succeed because his reading of the statute is incorrect. The WVRA protects *all* Washington voters from discrimination on the basis of race, color, and language minority group. On its face, the WVRA does not require race-based favoritism in local electoral systems, nor does it trigger strict scrutiny by granting special privileges, abridging voting rights, or otherwise classifying voters on the basis of race. Therefore, we hold that the plaintiffs have standing and that the WVRA is valid and constitutional on its face.[4] We affirm the

---

[3] "Language minority group" is a term that is "referenced and defined in the federal voting rights act [of 1965 (FVRA)], 52 U.S.C. 10301 et seq." RCW 29A.92.010(5). The FVRA, in turn, defines "language minority group" as "persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage." 52 U.S.C. § 10310(c)(3).

[4] We decline to reach the plaintiffs' argument that Gimenez failed to comply with RCW 7.24.110 and amici's argument that Gimenez lacks standing to appeal as a matter of right.

*Portugal et al. v. Franklin County et al.*, No. 100999-2

trial court, grant the plaintiffs' request for attorney fees and costs on appeal against

Gimenez, and remand for a determination of fees and costs incurred at the trial

court.

OVERVIEW OF THE WVRA

No Washington appellate court has previously considered the WVRA. To

provide context for this case, it is important to begin with an overview of the

relevant law and terminology.

A.     General provisions

The WVRA recognizes "that electoral systems that deny race, color, or

language minority groups an equal opportunity to elect candidates of their choice

are inconsistent with the right to free and equal elections." RCW 29A.92.005

(citing WASH. CONST. art. I, § 19, art. VI, § 1; U.S. CONST. amends. XIV, XV).

However, prior to the WVRA's enactment, Washington law "often prohibited"

local governments from making changes to their electoral systems, even in

response to changing demographics. *Id.* The legislature found that "in some cases,

this has resulted in an improper dilution of voting power," particularly as applied

to "minority groups." *Id.*

To protect the rights of Washington voters in local elections, the legislature

passed the WVRA in 2018. The WVRA provides that

> no method of electing the governing body of a political subdivision
> may be imposed or applied in a manner that impairs the ability of

4

> members of a protected class or classes to have an equal opportunity
> to elect candidates of their choice as a result of the dilution or
> abridgment of the rights of voters who are members of a protected
> class or classes.

RCW 29A.92.020. A "'[p]rotected class' means a class of voters who are members of a race, color, or language minority group, as this class is referenced and defined in the federal voting rights act [of 1965 (FVRA)], 52 U.S.C. 10301 et seq." RCW 29A.92.010(5). A "'[p]olitical subdivision'" includes "any county, city, town, school district, fire protection district, port district, or public utility district, but does not include the state." RCW 29A.92.010(4). Small cities, towns, and school districts are exempt from most of the WVRA's provisions. RCW 29A.92.700.

Two elements must be shown before a political subdivision may be found in violation of the WVRA:

> (a) Elections in the political subdivision exhibit polarized
> voting[5]; and
> (b) Members of a protected class or classes do not have an
> equal opportunity to elect candidates of their choice as a result of the
> dilution or abridgment of the rights of members of that protected class
> or classes.

---

[5] As discussed further below, "polarized voting" is "a difference . . . in the choice of candidates or other electoral choices that are preferred by voters in a protected class, and in the choice of candidates and electoral choices that are preferred by voters in the rest of the electorate." RCW 29A.92.010(3).

*Portugal et al. v. Franklin County et al.*, No. 100999-2

RCW 29A.92.030(1). There are definitions and guidelines for applying these

elements in individual cases. *See* RCW 29A.92.010, .030(2)-(6).

B.       Types of prohibited voting discrimination

The WVRA expressly protects against two types of voting discrimination:

"abridgment" and "dilution." RCW 29A.92.020, .030(1)(b). These terms are not

statutorily defined, and their meaning is not necessarily obvious. However, "courts

may rely on relevant federal case law for guidance" in interpreting the WVRA.

RCW 29A.92.010.

Federal cases use "abridgment" as a relatively general term. Practices that

"abridge" the right to vote on the basis of race or color have been expressly

prohibited by the Fifteenth Amendment since 1870 and by section 2 of the FVRA

(Section 2) since 1965. U.S. CONST. amend. XV, § 1; *Brnovich v. Democratic*

*Nat'l Comm.*, 594 U.S. ___, 141 S. Ct. 2321, 2331, 210 L. Ed. 2d 753 (2021)

(citing 79 Stat. 437). In its current form, Section 2 prohibits electoral systems and

practices "which result[ ] in a denial or abridgement" of voting rights based on

"race," "color," or membership in a "language minority group." 52 U.S.C.

§§ 10301(a), 10303(f)(2).

A Section 2 violation may be found if "the totality of circumstances" show

> that the political processes leading to nomination or election in the
> [jurisdiction] are not equally open to participation by members of a
> [protected class] in that its members have less opportunity than other

6

members of the electorate to participate in the political process and to
elect representatives of their choice.

52 U.S.C. § 10301(b). Thus, "an 'abridgement' of the right to vote" refers to an

electoral system or practice that impairs voting rights on the basis of race, color, or

language minority group, regardless of whether there was "outright denial of the

right" to vote. *Brnovich*, 141 S. Ct. at 2341.

For example, abridgment may be caused "by the requirement of the payment

of a poll tax as a precondition to voting" or by "the discriminatory use of literacy

tests." 52 U.S.C. § 10306(a); *Oregon v. Mitchell*, 400 U.S. 112, 132, 91 S. Ct. 260,

27 L. Ed. 2d 272 (1970) (plurality opinion). For many years, Washington State

abridged voting rights by imposing an English-language literacy requirement for

voter registration, while at the same time "vesting unlimited discretion in state

registration officers" to decide whether to administer a literacy test before

registering any particular individual to vote. 1967 Op. Att'y Gen. No. 21, at 5; *see*

LAWS OF 1901, ch. 135, § 4; LAWS OF 1965, ch. 9, § 29.07.070(13).

In contrast to "abridgment," federal courts use "dilution" as a technical term

of art. Dilution is a specific type of abridgment, which arises from the "features of

legislative districting plans." *Brnovich*, 141 S. Ct. at 2331. In a dilution claim, the

plaintiff alleges that their jurisdiction's districting plan "dilute[s] the ability of

particular voters to affect the outcome of elections." *Id.* Federal cases recognize

two primary forms of vote dilution.

*Portugal et al. v. Franklin County et al.*, No. 100999-2

First, vote dilution can be caused by the use of "multimember districts and at-large voting schemes,"[6] as opposed to single-member districts and district-based elections.[7] *Thornburg v. Gingles*, 478 U.S. 30, 47, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986). At-large elections may "'minimize or cancel out the voting strength of racial [minorities]'" because "the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters." *Id.* at 47-48 (alteration in original) (internal quotation marks omitted) (quoting *Burns v. Richardson*, 384 U.S. 73, 88, 86 S. Ct. 1286, 16 L. Ed. 2d 376 (1966)).

Second, vote dilution can occur in district-based elections through "the manipulation of district lines." *Voinovich v. Quilter*, 507 U.S. 146, 153, 113 S. Ct. 1149, 122 L. Ed. 2d 500 (1993). This often involves so-called "'cracking' and 'packing.'" *Gill v. Whitford*, 585 U.S. ___, 138 S. Ct. 1916, 1923, 201 L. Ed. 2d 313 (2018) (quoting record). "Cracking" occurs when a group of voters is split up "'among multiple districts so that they fall short of a majority in each one.'" *Id.* at 1924 (quoting record). "Packing" occurs when a group of voters is concentrated "'in a few districts that they win by overwhelming margins,'" thus preventing the group from electing its preferred candidates in other districts. *Id.* (quoting record).

---

[6] In an "at-large" election system, "voters of the entire jurisdiction elect the members to the governing body." RCW 29A.92.010(1)(a).

[7] In a "district-based" election system, "the candidate must reside within an election district that is a divisible part of the political subdivision and is elected only by voters residing within that election district." RCW 29A.92.010(2).

*Portugal et al. v. Franklin County et al.*, No. 100999-2

Both the WVRA and Section 2 of the FVRA prohibit vote dilution.  RCW 29A.92.020; *Brnovich*, 141 S. Ct. at 2333.  However, there are significant differences between the two, which affect both the range of available remedies and the elements required for a successful claim.

C.      The WVRA recognizes a broader range of redressable claims for vote dilution than those recognized by Section 2 of the FVRA

Section 2 recognizes only a few potential remedies for vote dilution.  Federal courts "have strongly preferred single-member districts" as the remedy of choice. *Growe v. Emison*, 507 U.S. 25, 40, 113 S. Ct. 1075, 122 L. Ed. 2d 388 (1993).  In addition, federal courts may order "the creation of majority-minority[8] districts [if] necessary to remedy a violation of federal law." *Quilter*, 507 U.S. at 156.  However, Section 2 does not require other remedies, such as so-called "influence districts"[9] or "crossover district[s]."[10] *Bartlett v. Strickland*, 556 U.S. 1, 13, 129 S. Ct. 1231, 173 L. Ed. 2d 173 (2009) (plurality opinion).  Instead, courts adjudicating Section 2 claims are generally limited to ordering single-member districts and, in some cases, majority-minority districts.

---

[8] "In majority-minority districts, a minority group composes a numerical, working majority of the voting-age population," thereby creating an opportunity for the minority group to elect its candidate of choice in that district. *Bartlett v. Strickland*, 556 U.S. 1, 13, 129 S. Ct. 1231, 173 L. Ed. 2d 173 (2009) (plurality opinion).

[9] In an "influence district[ ] . . . a minority group can influence the outcome of an election even if its preferred candidate cannot be elected." *Id.*

[10] "[I]n a crossover district, the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Id.*

Due to these limits on available remedies, a plaintiff asserting a Section 2 vote dilution claim

> must prove three threshold conditions: first, "that [the minority group] is sufficiently large and geographically compact to constitute a majority in a single-member district"; second, "that [the minority group] is politically cohesive"; and third, "that the . . . majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."

*Emison*, 507 U.S. at 40 (some alterations in original) (quoting *Gingles*, 478 U.S. at 50-51). These threshold conditions are generally referred to as the "*Gingles* factors" or "*Gingles* requirements."

As the United States Supreme Court has explained, the *Gingles* factors are necessary in Section 2 vote dilution cases to ensure that the plaintiff has stated a redressable injury. In other words, the *Gingles* factors require the plaintiff to show that their concerns could, at least potentially, be addressed by implementing single-member districts, majority-minority districts, or both:

> The "geographically compact majority" and "minority political cohesion" showings are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district, [a]nd the "minority political cohesion" and "majority bloc voting" showings are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger . . . voting population.

*Id.* (citing *Gingles*, 478 U.S. at 50 n.17, 51). "[O]nly when a party has established the *Gingles* requirements does a court proceed to analyze whether a violation [of

10

*Portugal et al. v. Franklin County et al.*, No. 100999-2

Section 2] has occurred based on the totality of the circumstances." *Strickland*,

556 U.S. at 11-12.

By contrast, the WVRA contemplates a much broader range of available

remedies. Similar to Section 2, the WVRA permits courts to order a political

subdivision to implement "a district-based election system" and "to draw or redraw

district boundaries." RCW 29A.92.110(1). However, unlike Section 2, courts

adjudicating WVRA claims are "not limited to" these examples, and any remedy

must be "tailor[ed]" to the political subdivision at issue. RCW 29A.92.110(1)-(2).

For example, in direct contrast to the FVRA, the WVRA explicitly allows

for the creation of a crossover or "coalition"[11] district "that provides the protected

class the opportunity to join in a coalition of two or more protected classes to elect

candidates of their choice if there is demonstrated political cohesion among the

protected classes." RCW 29A.92.110(2). Other potential remedies include, but

are not necessarily limited to,

- limited voting, where a voter receives fewer votes than there are candidates to elect;
- cumulative voting, where a voter receives as many votes as there are candidates to elect, but may cast multiple votes for a single candidate; and
- single transferrable or ranked choice voting, where a voter ranks candidates in order of preference, and votes are transferred to lower-ranked candidates who are not elected on first-place votes if a majority is not reached.

---

[11] In a coalition district, "two minority groups form a coalition to elect the candidate of the coalition's choice." *Id.*

11

*Portugal et al. v. Franklin County et al.*, No. 100999-2

FINAL B. REP. ON ENGROSSED SUBSTITUTE S.B. 6002, at 2, 65th Leg., Reg. Sess.

(Wash. 2018).

Thus, on its face, the WVRA permits remedies that Section 2 does not.  This

does not create a conflict between state and federal law because the states are free

to implement remedies that are not *required* pursuant to Section 2, so long as those

remedies are not otherwise *prohibited*.  *See Strickland*, 556 U.S. at 23 ("Our

holding that [Section] 2 does not require crossover districts does not consider the

permissibility of such districts as a matter of legislative choice or discretion.");

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 430, 126 S. Ct. 2594,

165 L. Ed. 2d 609 (2006) (*LULAC*) ("To be sure, [Section] 2 does not forbid the

creation of a noncompact majority-minority district.").

Because the WVRA contemplates a broader range of remedies than Section

2, a WVRA plaintiff can state a redressable injury under a broader range of

circumstances than a Section 2 plaintiff.  This is reflected in the elements required

to prove a WVRA claim.

Similar to Section 2, the WVRA requires the plaintiff to show that

"[e]lections in the political subdivision exhibit polarized voting."  RCW

29A.92.030(1)(a).  This requirement corresponds to the second and third *Gingles*

factors, discussed above: "the minority group must be able to show that it is

politically cohesive" and that the "majority [group] votes sufficiently as a bloc to

*Portugal et al. v. Franklin County et al.*, No. 100999-2

enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51; *see* RCW 29A.92.010(3). The WVRA is also similar to Section 2 in placing the ultimate burden on the plaintiff to prove that "[m]embers of a protected class or classes do not have an equal opportunity to elect candidates of their choice as a result of the dilution or abridgment of the rights of members of that protected class or classes." RCW 29A.92.030(1)(b); *cf.* 52 U.S.C. § 10301(b).

However, unlike Section 2, the WVRA specifically rejects the first *Gingles* factor as a *threshold* requirement: "The fact that members of a protected class are not geographically compact or concentrated to constitute a majority in a proposed or existing district-based election district shall not preclude a finding of a violation under this chapter." RCW 29A.92.030(2). *Contra Gingles*, 478 U.S. at 50. Instead, the WVRA provides that geographical compactness "may be a factor in determining a *remedy*." RCW 29A.92.030(2) (emphasis added).

Thus, if the plaintiff in a WVRA case seeks the creation of a so-called "majority-minority" district, they may be required at the remedy stage to show that the minority group is sufficiently geographically compact to constitute a majority in the proposed district—just as a Section 2 plaintiff would need to do at the threshold stage. *Cf. Gingles*, 478 U.S. at 50 & n.17. By contrast, if the plaintiff in a WVRA case seeks only the implementation of a ranked choice voting system for

13

at-large elections, a showing of geographical compactness would be both irrelevant and unnecessary at any stage.

D.      Enforcement of the WVRA

The WVRA includes two mechanisms to promote compliance: voluntary changes by political subdivisions and challenges by local voters.

A political subdivision may voluntarily "change its electoral system . . . to remedy a potential violation" of the WVRA. RCW 29A.92.040(1). If the political subdivision wishes to draw or redraw its election districts, then it must comply with specific criteria. RCW 29A.92.050(3). In addition, before implementing any voluntary changes, "the political subdivision must provide public notice" and "hold at least one public hearing." RCW 29A.92.050(1)(a)-(b).

Local voters may also "challenge a political subdivision's electoral system" for alleged WVRA violations. RCW 29A.92.060(1). The voter must "first notify the political subdivision," which must work with the voter "in good faith." *Id.*; RCW 29A.92.070(1). If the political subdivision wishes to implement a remedy at this stage, it must "seek a court order acknowledging that the . . . remedy complies with RCW 29A.92.020 and was prompted by a plausible violation." RCW 29A.92.070(2). There is "a rebuttable presumption that the court will decline to approve the political subdivision's proposed remedy." *Id.*

*Portugal et al. v. Franklin County et al.*, No. 100999-2

If a political subdivision receives notice of an alleged WVRA violation but fails to implement a court-approved remedy within a specified time frame, then "any voter who resides in [the] political subdivision . . . may file an action" in superior court. RCW 29A.92.090(1). Such an action is subject to the WVRA's provisions on venue, time for trial, statute of limitations, and similar issues. *See* RCW 29A.92.090-.100. If the trial court finds that the political subdivision has violated the WVRA, then it "may order appropriate remedies," as discussed above. RCW 29A.92.110(1). Once the political subdivision implements a court-approved remedy, it is largely shielded from WVRA challenges for the next four years. *See* RCW 29A.92.070(3), .080(3), .120(1).

Since the WVRA was enacted in 2018, several political subdivisions have made changes to their electoral systems. However, this will be the first time that any Washington appellate court addresses the WVRA.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises from a voter-initiated challenge to Franklin County's system for electing its three-member board of commissioners. Franklin County is located in southeastern Washington, with its county seat in the city of Pasco. *Find Us*, FRANKLIN COUNTY, https://www.franklincountywa.gov/508/Find-Us (last visited June 5, 2023). About 54 percent of the county's total population is "Hispanic or

15

*Portugal et al. v. Franklin County et al.*, No. 100999-2

Latino."[12]  *QuickFacts, Franklin County, Washington*, U.S. CENSUS BUREAU,

https://www.census.gov/quickfacts/franklincountywashington (last visited June 5,

2023).  "Latino citizens make up over one third, or 34.4%, of Franklin County's

citizen voting age population."  CP at 5.

A.      The plaintiffs notify Franklin County of an alleged WVRA violation and
        ultimately file suit

        Prior to this case, Franklin County used "a 'hybrid' election system," which

combined district-based primaries with at-large general elections:

> [P]otential candidates [ran] in their respective districts and the top two
> candidates proceed[ed] to the general election.  The general election
> [was] then conducted as an at-large election, in which all voters in the
> County cast votes to seat a county commissioner in each seat the year
> that position is up for election.

*Id.* at 1010.  In October 2020, counsel for the plaintiffs[13] sent Franklin County a

notice alleging that its electoral system violated the WVRA.

        According to the plaintiffs' notice, the county's "at-large general elections

for commissioners prevent Latinos from electing a candidate of choice" and

"Franklin County has diluted the Latino community's votes by cracking the

---

[12] "The [United States] Office of Management and Budget (OMB) requires federal agencies to use a minimum of two ethnicities in collecting and reporting data: Hispanic or Latino and Not Hispanic or Latino. OMB defines 'Hispanic or Latino' as a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race." CP at 558.

[13] The individual plaintiffs are Gabriel Portugal, Brandon Paul Morales, and Jose Trinidad Corral, "Latino registered voters who reside in Franklin County."  *Id.* at 2.  League of United Latin American Citizens (LULAC) is also a named plaintiff.  *Id.* at 3.  None of the parties or amici distinguish between the individual plaintiffs and LULAC.

16

population into different districts." *Id.* at 116-17. The notice further alleged that "as a result of the County's discriminatory electoral scheme, there are no Latino preferred candidates currently serving on the Franklin County Board of Commissioners, nor has there ever been one elected to serve on the commission." *Id.* at 116.

Franklin County did not take remedial action within the then applicable six-month time frame. *See* RCW 29A.92.080(1). The plaintiffs subsequently filed a WVRA claim in Franklin County Superior Court against Franklin County and each member of the Franklin County Board of Commissioners (Clint Didier, Rodney J. Mullen, and Lowell B. Peck) in their official capacities.

B. James Gimenez intervenes to defend Franklin County's electoral system

The procedural history of this litigation is fairly complicated, but many of the details are irrelevant to our review. To briefly summarize, the plaintiffs moved for partial summary judgment on the issue of whether Franklin County's electoral system violated the WVRA. The defendants conceded the WVRA violation because they could not make a contrary argument "in good faith." CP at 170. The trial court granted partial summary judgment and ordered the parties to "work cooperatively together on the development of the district map." *Id.* at 259. However, this order was vacated shortly after it was entered.

17

Three days after the trial court granted partial summary judgment, Gimenez moved to intervene to defend Franklin County's existing electoral system, alleging that the plaintiffs lack standing and that the WVRA is facially unconstitutional. One week later, the Franklin County Board of Commissioners adopted a resolution directing the county prosecutor to "seek reconsideration of the order granting Summary Judgement [sic]." *Id.* at 275. As directed, the prosecutor moved to vacate the summary judgment order, asserting that the "Board of Commissioners never authorized or gave direction in an open public meeting to the Franklin County Prosecutor to stipulate to an order granting summary judgment in favor of the Plaintiffs." *Id.* at 318.

Over the plaintiffs' objections, the trial court granted the defendants' motion to vacate and Gimenez's motion to intervene.

C.      The trial court denies Gimenez's motion to dismiss and approves the parties' CR 2A settlement agreement

After his motion to intervene was granted, Gimenez immediately moved for dismissal pursuant to CR 12(c), arguing that the plaintiffs lack standing and that the WVRA is facially invalid. The trial court denied Gimenez's CR 12(c) motion on its merits.

The plaintiffs subsequently filed a second motion for partial summary judgment. As they had done in their first motion, the plaintiffs sought a ruling that Franklin County's electoral system violated the WVRA, leaving only "the question

18

of an appropriate remedial map" for trial. *Id.* at 682. The defendants initially opposed summary judgment, but the parties ultimately entered into a CR 2A settlement agreement, "which was ratified by Defendant Commissioners in a Franklin County commissioner meeting." *Id.* at 1288.

The settlement agreement allowed Franklin County to use a district map that its board of commissioners had already "approved and adopted" following the 2020 U.S. Census. *Id.* at 1292. However, "[b]eginning with the 2024 election cycle, all future elections for the office of Franklin County Commissioner will be conducted under a single-member district election system for both primary and general elections." *Id.* The plaintiffs also agreed to accept a reduced award of attorney fees and costs from the defendants. Over Gimenez's objection, the trial court approved the parties' CR 2A settlement and dismissed the plaintiffs' claims with prejudice.

Gimenez appealed directly to this court. The plaintiffs opposed Gimenez's arguments on the merits, but they agreed that direct review was appropriate. We retained the case for a decision on the merits and accepted six amici briefs for filing.[14] We have not received any appellate filings from Franklin County or any member of the Franklin County Board of Commissioners.

---

[14] An amicus brief supporting Gimenez was filed by the American Civil Rights Project (ACRP). Amici briefs supporting the plaintiffs were filed by (1) the Civil Rights and Justice Clinic at the University of Washington School of Law and the Election Law Clinic at Harvard

*Portugal et al. v. Franklin County et al.*, No. 100999-2

ISSUES

A.      Do the plaintiffs have standing to bring a WVRA claim?

B.      Did the legislature repeal the WVRA by implication?

C.      Does the WVRA facially violate the privileges and immunities clause of article I, section 12 of the Washington Constitution?

D.      Does the WVRA facially violate the equal protection clause of the Fourteenth Amendment to the United States Constitution?

E.      Should we reach the additional issues raised by plaintiffs and amici?

F.      Should we grant the plaintiffs' request for attorney fees and costs?

ANALYSIS

Each of Gimenez's arguments is based on his interpretation of the WVRA's definition of a "protected class."  He believes that this definition protects some racial groups, while excluding others.  As a result, Gimenez believes that the WVRA requires local governments to implement electoral systems that favor some racial groups, while disfavoring others.

Statutory interpretation is a matter of law, so our review is de novo.  *Woods v. Seattle's Union Gospel Mission*, 197 Wn.2d 231, 238, 481 P.3d 1060 (2021), *cert. denied*, 142 S. Ct. 1094 (2022).  We reject Gimenez's interpretation of the

---

Law School, (2) OneAmerica and the Campaign Legal Center, (3) the Fred T. Korematsu Center for Law and Equality and the American Civil Liberties Union of Washington, (4) the Brennan Center for Justice, and (5) the State of Washington.

20

*Portugal et al. v. Franklin County et al.*, No. 100999-2

WVRA.  The plain language of the statute and basic principles of statutory interpretation show that the WVRA protects *all* Washington voters from discrimination on the basis of race, color, and language minority group.  Therefore, the plaintiffs in this case have standing and the WVRA has not been repealed by implication.

Gimenez's constitutional challenges to the WVRA are also subject to de novo review.  *Id.*  "We presume statutes are constitutional, and the party challenging constitutionality bears the burden of proving otherwise."  *Id.* at 239.  Because Gimenez makes facial challenges, his arguments "must be rejected unless there is '*no set of circumstances* in which the statute . . . can constitutionally be applied.'"  *Id.* at 240 (quoting *In re Det. of Turay*, 139 Wn.2d 379, 417 n.27, 986 P.2d 790 (1999)).  The WVRA can clearly be applied in a manner that does not violate article I, section 12 because, on its face, the WVRA does not grant any privilege or immunity to any class of citizens.

Finally, contrary to Gimenez's view, his federal equal protection claim does not trigger strict scrutiny because the WVRA, on its face, does not "create racial classifications."  *Contra* Br. of Appellant at 17.  Strict scrutiny could certainly be triggered in an *as-applied* challenge to "districting maps that sort voters on the basis of race" or to some other "race-based sorting of voters."  *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. __, 142 S. Ct. 1245, 1248, 212 L. Ed. 2d 251

21

(2022) (per curiam). However, on its face, the WVRA requires "equal opportunit[ies]" for voters of all races, colors, and language minority groups, not race-based sorting of voters. RCW 29A.92.020.

Gimenez appears to argue that the WVRA makes "racial classifications" by recognizing the existence of race, color, and language minority groups and prohibiting discrimination on that basis. Br. of Appellant at 17. He also appears to argue that the WVRA *must* favor some racial groups and disfavor others because "[e]lections are quintessentially zero-sum." *Id.* at 53. We cannot agree. If Gimenez's position were correct, then every statute prohibiting racial discrimination or mandating equal voting rights would be subject to facial equal protection challenges triggering strict scrutiny. No authority supports that position. Therefore, we hold that Gimenez's equal protection claim triggers only rational basis review, which the WVRA easily satisfies on its face.

We grant the plaintiffs' request for attorney fees in part. We award fees and costs incurred at trial and on appeal against Gimenez, and we remand to the trial court for a calculation of the fees and costs incurred at the trial court. However, we decline the plaintiffs' request to assess fees against Commissioner Didier.

A.     The plaintiffs have standing

According to Gimenez, the WVRA's protections simply do not apply to members of a race, color, or language minority group that comprises a numerical

majority of the total population in their local jurisdiction. Slightly over 50 percent of Franklin County's total population is Latinx. Therefore, according to Gimenez, it is impossible for *any* Latinx voter in Franklin County to have standing to bring a WRVA claim, unless they happen to be a member of some other protected class. The trial court rejected Gimenez's interpretation and ruled that the plaintiffs have standing. We affirm.

1. The plain statutory language and principles of statutory interpretation show that the WVRA's protections apply to all Washington voters

The plain meaning of the WVRA applies to all Washington voters. As discussed above, the WVRA prohibits voting discrimination against "members of a protected class or classes." RCW 29A.92.020. A "protected class" is "a class of voters who are members of a race, color, or language minority group." RCW 29A.92.010(5). Everyone can be a member of a race or races, everyone has a color, and "language minority group" includes ethnic groups that might otherwise be wrongfully excluded—"persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage."[15] 52 U.S.C. § 10310(3)(c). As a result,

---

[15] Gimenez and amicus ACRP argue that "Spanish heritage" does not refer to ethnicity but to "those who speak Spanish." Br. of Appellant at 36; *see generally* Br. of ACRP as Amicus Curiae in Supp. of Intervenor Def.-Appellant (Amicus Br. of ACRP). They acknowledge that no case law supports this interpretation. To the contrary, United States Supreme Court precedent has applied the FVRA's protections to Latinx voters. *E.g.*, *LULAC*, 548 U.S. 399 (partial plurality opinion). Nevertheless, Gimenez argues that if "Spanish heritage" refers to ethnicity, then it is "superfluous" because ethnicity is "already captured by the preceding categories" of race and color. Br. of Appellant at 36. However, elsewhere in his briefing, Gimenez questions whether "'Hispanics' are a race," and amicus argues that they are not. Reply Br. of Appellant at

*Portugal et al. v. Franklin County et al.*, No. 100999-2

every Washington voter is a member of at least one protected class, so every Washington voter is protected by the WVRA.

The statute's plain meaning is confirmed by "traditional rules of grammar." *PeaceHealth St. Joseph Med. Ctr. v. Dep't of Revenue*, 196 Wn.2d 1, 8, 468 P.3d 1056 (2020). For instance, "[w]hen evaluating the language of a statute, we apply the last antecedent rule" absent evidence of a contrary legislative intent. *City of Spokane v. Spokane County*, 158 Wn.2d 661, 673, 146 P.3d 893 (2006). The last antecedent rule shows that "minority group" modifies only "language," not "race" or "color." *See id.*; RCW 29A.92.010(5). If the legislature had intended otherwise, then the WVRA would refer to "rac<u>ial</u>" groups, not "race" groups.

Principles of statutory interpretation further confirm that the WVRA "'says what it means and means what it says.'" *City of Seattle v. Long*, 198 Wn.2d 136, 149, 493 P.3d 94 (2021) (quoting *State v. Costich*, 152 Wn.2d 463, 470, 98 P.3d 795 (2004)). Statutory language must be interpreted in "the context of the statute, related provisions, and the statutory scheme as a whole." *Id.* at 148. The WVRA recognizes that voters must have an "*equal* opportunity to elect candidates of their choice." RCW 29A.92.020, .030(1)(b) (emphasis added). Equality would not be possible if the WVRA protected the members of some racial groups and excluded

---

1 n.1; *see also* Amicus Br. of ACRP at 13-14 n.30. Including Latinx ethnicities within "language minority groups," as other courts have consistently done based on the statute's plain language, forecloses the need for such arguments and, therefore, is not superfluous.

24

*Portugal et al. v. Franklin County et al.*, No. 100999-2

others. Moreover, the WVRA does not say that a political subdivision's electoral system may be challenged by "minorities," "minority voters," "minority groups," or anything similar. Instead, the WVRA allows for a challenge by "*any* voter who resides in a political subdivision where a violation of RCW 29A.92.020 is alleged."[16] RCW 29A.92.090(1) (emphasis added).

In addition, as the trial court correctly ruled, Gimenez's narrow statutory interpretation is inconsistent with the WVRA's remedial purpose. "Ultimately, in resolving a question of statutory construction, this court will adopt the interpretation which best advances the legislative purpose." *Bennett v. Hardy*, 113 Wn.2d 912, 928, 784 P.2d 1258 (1990). The stated legislative purpose of the WVRA is to prohibit "electoral systems that deny race, color, or language minority groups an equal opportunity to elect candidates of their choice." RCW 29A.92.005. It would improperly frustrate this purpose to hold that the WVRA's protections are inapplicable to many Washington voters, as Gimenez claims.

Finally, we consider persuasive authority from California and federal courts. The WVRA's definition of a protected class is identical to the definition of a protected class in California's voting rights act. *Compare* RCW 29A.92.010(5), *with* CAL. ELEC. CODE § 14026(d). In 2006, the California Court of Appeals

---

[16] It is undisputed that the voter bringing the challenge must be a member of the race, color, or language minority group whose rights they seek to vindicate.

25

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

recognized that this definition "simply gives a cause of action to members of *any* racial or ethnic group that can establish that its members' votes are diluted." *Sanchez v. City of Modesto*, 145 Cal. App. 4th 660, 666, 51 Cal. Rptr. 3d 821 (2006). The WVRA adopted the same definition 12 years later.

If our legislature intended to enact a different definition of a protected class, it had ample time to change the language. Instead, our legislature adopted California's definition verbatim. Absent "contrary legislative intent, when a state statute is 'taken substantially verbatim'" from another jurisdiction, "'it carries the same construction.'" *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 868, 281 P.3d 289 (2012) (internal quotation marks omitted) (quoting *State v. Bobic*, 140 Wn.2d 250, 264, 996 P.2d 610 (2000)). Thus, California's broad interpretation of the definition of a protected class is highly persuasive when interpreting the same language in the WVRA.

In addition, "courts may rely on relevant federal case law for guidance" when interpreting the WVRA. RCW 29A.92.010. As the California Court of Appeals explained, "In a variety of contexts, the [United States] Supreme Court has held that the term 'race' is expansive and covers all ethnic and racial groups." *Sanchez*, 145 Cal. App. 4th at 684. Notably, the Supreme Court has held that the Fifteenth Amendment's prohibition on "deny[ing] or abridg[ing] the right to vote on account of race . . . grants protection to *all* persons, not just members of a

26

particular race." *Rice v. Cayetano*, 528 U.S. 495, 512, 120 S. Ct. 1044, 145

L. Ed. 2d 1007 (2000) (emphasis added).

Like the United States Supreme Court, this court has previously refused to

apply narrow definitions when deciding whether a person is protected from

discrimination on the basis of "race." *See State v. Zamora*, 199 Wn.2d 698, 704

n.6, 512 P.3d 512 (2022) (quoting *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 214,

137 S. Ct. 855, 197 L. Ed. 2d 107 (2017)). We decline to change our approach

now. Instead, we apply the plain statutory language and hold that the WVRA's

protections apply to all Washington voters.

2.    We decline Gimenez's invitation to rewrite the statute

Gimenez acknowledges that it is both "plausible" and "grammatically

permissible" to interpret the WVRA as protecting all Washington voters. Br. of

Appellant at 13-14. Nevertheless, he argues that we must restructure and rewrite

the statute as follows:

> "'Protected class' means
>     (a) a class of voters who are members of a race <u>minority group</u>;
> or
>     (b) a class of voters who are members of a color <u>minority
> group</u>; or
>     (c) a class of voters who are members of a language minority
> group, as this class is referenced and defined in the federal voting
> rights act, 52 U.S.C. 10301 *et seq*."

*Id.* at 10 (underlining added). "Courts may not 'rewrite unambiguous statutory

language under the guise of interpretation.'" *State v. Hawkins*, 200 Wn.2d 477,

27

*Portugal et al. v. Franklin County et al.*, No. 100999-2

492, 519 P.3d 182 (2022) (quoting *Jespersen v. Clark County*, 199 Wn. App. 568, 578, 399 P.3d 1209 (2017)).  However, Gimenez argues that this court must judicially rewrite the WVRA.  He is incorrect.

First, Gimenez points to the WVRA's statement of legislative findings and intent, which appears to use "minority groups" as a shorthand for "race, color, or language minority groups."  RCW 29A.92.005.  However, there is no indication that this was intended to exclude certain racial groups from the WVRA's protections.  Indeed, the stand-alone phrase "minority groups" is not defined (or even used) anywhere else in the WVRA.

It would be both absurd and contrary to precedent to hold that the statement of legislative findings negates the plain language of the WVRA's operative provisions.  "Declarations of intent are not controlling; instead, they serve 'only as an important guide in determining the intended effect of the operative sections.'"  *State v. Reis*, 183 Wn.2d 197, 212, 351 P.3d 127 (2015) (quoting *Kilian v. Atkinson*, 147 Wn.2d 16, 23, 50 P.3d 638 (2002)).  The legislature may have found that minority groups would benefit from the WVRA, but that does not mean the legislature intended to exclude everyone else.

Next, Gimenez appears to argue that the WVRA cannot be intended to protect all racial groups because it is "impossible" for a majority group to experience voting discrimination.  Br. of Appellant at 26.  According to Gimenez,

28

*Portugal et al. v. Franklin County et al.*, No. 100999-2

"if the 'protected class' constitutes a majority of the political subdivision . . . it would not lack an equal opportunity to elect candidates of choice due to vote dilution within that subdivision." *Id.* at 25-26 (emphasis omitted).

In this argument, Gimenez appears to assume that the WVRA recognizes only vote *dilution* claims. To the contrary, as discussed above, the WVRA prohibits both "dilution" and "abridgment" of voting rights on the basis of race, color, or language minority group. RCW 29A.92.020. Abridgment of the right to vote can occur regardless of which racial group is in the majority.

For instance, abridgment would likely be found if voting registration officials "administered literacy tests to Mexican-American members of the plaintiffs' class more frequently, more carefully, and more stringently than they have administered them to other persons, including Anglo-Americans whose ability to read and speak English is imperfect or limited." *Mexican-Am. Fed'n-Wash. State v. Naff*, 299 F. Supp. 587, 593 (E.D. Wash. 1969), *judgment vacated sub nom. Jimenez v. Naff*, 400 U.S. 986 (1971); *see also* 1967 Op. Att'y Gen. No. 21. "Indeed, the most egregious examples of Jim Crow era voter suppression—such as poll taxes and literacy tests—were specifically designed to prevent Black majorities from participating in elections." Amicus Br. of State of Wash. at 11-12 (citing Brad Epperly et al., *Rule by Violence, Rule by Law: Lynching, Jim Crow,*

29

*and the Continuing Evolution of Voter Suppression in the U.S.*, 18 PERSPS. ON POL.

756, 761-64 (2020)).

Moreover, it is entirely possible to dilute the voting power of majority

groups through the manipulation of district lines.  The United States Supreme

Court has already explained how:

> Assume a hypothetical jurisdiction of 1,000 voters divided into 10 districts of 100 each, where members of a minority group make up 40 percent of the voting population and voting is totally polarized along racial lines. With the right geographic dispersion to satisfy the compactness requirement, and with careful manipulation of district lines, the minority voters might be placed in control of as many as 7 of the 10 districts.

*Johnson v. De Grandy*, 512 U.S. 997, 1016, 114 S. Ct. 2647, 129 L. Ed. 2d 775

(1994).  Thus, to the extent that Gimenez believes that the WVRA does not protect

majority groups because they do not need the WVRA's protection, he is simply

incorrect.

In sum, the WVRA means exactly what it says.  All Washington voters are

protected from discrimination on the basis of race, color, or language minority

group.  That includes the plaintiffs.  Therefore, the trial court correctly ruled that

the plaintiffs have standing to bring their WVRA claim.

B.    The WVRA has not been repealed by implication

Next, Gimenez argues that the WVRA gives minority groups the exclusive

"right to sue to compel redistricting, and require[s] the county to favor the racial

*Portugal et al. v. Franklin County et al.*, No. 100999-2

group which sued in drawing new district lines." Br. of Appellant at 17-18. He contends that this irreconcilably conflicts with RCW 29A.76.010(4)(d), which provides that when a county engages in periodic redistricting after a census, "[p]opulation data may not be used for purposes of favoring or disfavoring any racial group or political party." Due to this alleged conflict, Gimenez believes that every time RCW 29A.76.010 was amended, the WVRA was implicitly repealed, at least as applied to counties. He is incorrect. The WVRA neither requires nor allows the kind of race-based favoritism that RCW 29A.76.010(4)(d) prohibits.

First, as discussed above, the WVRA's protections apply to all Washington voters, and all Washington voters have standing to bring a WVRA challenge. The WVRA does not compel race-based favoritism; it explicitly requires "an equal opportunity" in local elections for voters of all races, colors, and language minority groups. RCW 29A.92.020.

Second, contrary to Gimenez's interpretation, a political subdivision cannot be compelled to do *anything* pursuant to the WVRA based on the "single factor" of "racially polarized voting, *i.e.*, the fact that voters of different races tend to vote for different candidates." *Contra* Br. of Appellant at 45. In fact, the plain language of the WVRA provides that a plaintiff must prove *both* that "[e]lections in the political subdivision exhibit polarized voting" *and* that "[m]embers of a protected class or classes do not have an equal opportunity to elect candidates of their choice

31

as a result of the dilution or abridgment of the rights of members of that protected class or classes." RCW 29A.92.030(1)(b). Thus, the WVRA does not require local governments to favor "race minority 'haves'" at the expense of "race majority 'have-nots.'" *Contra* Reply Br. of Appellant at 18. The WVRA does not compel local governments to do anything based on *race*. Instead, the WVRA may compel local governments to change their electoral systems to remedy proven *racial discrimination*.

Gimenez appears to believe that actions to remedy proven racial discrimination are indistinguishable from actions based on race alone. He also argues that the WVRA actually "*forbids* consideration of . . . past discrimination" because the WVRA does not require "[p]roof of intent on the part of the voters or elected officials to discriminate against a protected class." Br. of Appellant at 4 (emphasis added); RCW 29A.92.030(5). We disagree. On its face, the WVRA simply codifies the following, indisputable propositions:

(1) Voters can be "members of a race, color, or language minority group." RCW 29A.92.010(5). Recognizing the existence of race, color, and language minority groups does not, in itself, "create racial classifications." *Contra* Br. of Appellant at 17. *See* U.S. CONST. amend. XV; 52 U.S.C. §§ 10301(a), 10303(f)(2).

(2) "Polarized voting" is possible. RCW 29A.92.010(3). Recognizing the possibility of racially polarized voting is neither novel nor unique to the WVRA.

*Portugal et al. v. Franklin County et al.*, No. 100999-2

*See generally Gingles*, 478 U.S. 30. Moreover, even where polarized voting is proved to exist, that is not sufficient, by itself, to prove a WVRA violation. RCW 29A.92.030(1).

(3) A combination of polarized voting and "dilution or abridgment" of voting rights can deprive members of a race, color, or language minority group of an "equal opportunity to elect candidates of their choice" in local elections. RCW 29A.92.030(1)(b); *cf.* U.S. CONST. amend. XV; 52 U.S.C. §§ 10301, 10303(f)(2).

(4) Where a class of voters has been deprived of equal electoral opportunities on the basis of race, color, or language minority group, the law can provide a remedy based on "discriminatory effect alone," even in the absence of discriminatory intent. *Gingles*, 478 U.S. at 35; *see* U.S. CONST. amend. XV, § 2; 52 U.S.C. §§ 10301, 10303(f)(2).

We hold that the WVRA does not irreconcilably conflict with RCW 29A.76.010(4)(d) because on its face, the WVRA requires equality, not race-based favoritism, in electoral systems. Thus, the legislature has not implicitly repealed the WVRA.

C. The WVRA does not facially violate article I, section 12

Next, Gimenez argues that the WVRA violates article I, section 12 on its face because "it grants to a specific identified class the right and privilege to have county commissioner boundaries drawn so that members of that identified class—

33

but not the public at large, or members of other definable classes—can elect a 'candidate of choice.'" Br. of Appellant at 52. As detailed above, Gimenez fundamentally misinterprets what the WVRA says and does. We therefore reject his article I, section 12 argument.

"'For a violation of article I, section 12 to occur, the law . . . must confer a privilege to a class of citizens.'" *Madison v. State*, 161 Wn.2d 85, 95, 163 P.3d 757 (2007) (quoting *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 812, 83 P.3d 419 (2004)). The WVRA does not confer any privilege to any class of citizens. Instead, the WVRA protects the "*equal* opportunity" of voters of *all* races, colors, and language minority groups "to elect candidates of their choice." RCW 29A.92.020, .030(1)(b) (emphasis added). Therefore, all Washington voters have equal rights to challenge their local governments for alleged WVRA violations. If, in some future case, the WVRA is applied or interpreted in way that grants privileges to some racial groups while excluding others, then the WVRA will be subject to an as-applied challenge. But on its face, the WVRA simply does not implicate article I, section 12.

D.    The WVRA does not facially violate the equal protection clause

Finally, Gimenez argues that the WVRA facially violates the equal protection clause of the Fourteenth Amendment because the WVRA cannot survive strict scrutiny. However, as explained above, the WVRA on its face does

34

*Portugal et al. v. Franklin County et al.*, No. 100999-2

not classify voters on the basis of race, nor does it deprive anyone of the fundamental right to vote. Instead, the WVRA mandates *equal* voting opportunities for members of every race, color, and language minority group. Therefore, Gimenez's facial equal protection claim triggers rational basis review, not strict scrutiny. *Cf. Madison*, 161 Wn.2d at 103. Rational basis review is satisfied if "there is a rational relationship between" the WVRA "and any legitimate governmental interests." *Id.* at 106.

To the extent that Gimenez's equal protection argument is based on his misinterpretation of the WVRA, we reject it. The WVRA's mandate for equal voting opportunities is clearly rationally related to the State's legitimate interest in protecting Washington voters from discrimination. "[A] law directing state actors to provide equal protection is (to say the least) facially neutral, and cannot violate the Constitution." *Schuette v. Coal. to Def. Affirmative Action*, 572 U.S. 291, 318, 134 S. Ct. 1623, 188 L. Ed. 2d 613 (2014) (Scalia, J., concurring in the judgment).

Gimenez further points out, correctly, that Section 2 of the FVRA has a threshold requirement for vote dilution claims that the WVRA does not have. As discussed above, before a federal court will reach the merits of a Section 2 vote dilution claim, a "group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. By contrast, the WVRA provides that "[t]he fact that

35

*Portugal et al. v. Franklin County et al.*, No. 100999-2

members of a protected class are not geographically compact or concentrated to constitute a majority in a proposed or existing district-based election district shall not preclude a finding of a violation under this chapter, but may be a factor in determining a remedy." RCW 29A.92.030(2).

Gimenez argues that the WVRA is unconstitutional on its face because "[w]ithout the compactness precondition, the [United States] Supreme Court has made clear, Section 2 could never" satisfy the equal protection clause. Br. of Appellant at 40-41. However, he does not cite a single case—from any court—that actually says what he claims. Instead, Gimenez relies on cases addressing as-applied challenges to specific redistricting plans based on allegations of racial gerrymandering. *See id.* at 37-50.[17] These cases consistently hold that *Section 2* requires a threshold showing of compactness in a vote dilution claim. *E.g.*, *Strickland*, 556 U.S. at 10-16, 20-21; *Emison*, 507 U.S. at 40-41. However,

---

[17] Citing *Shaw v. Reno*, 509 U.S. 630, 642-43, 647, 651, 657, 113 S. Ct. 2816, 125 L. Ed. 2d 511 (1993); *Miller v. Johnson*, 515 U.S. 900, 926-28, 115 S. Ct. 2475, 132 L. Ed. 2d 762 (1995); *Georgia v. Ashcroft*, 539 U.S. 461, 491, 123 S. Ct. 2498, 156 L. Ed. 2d 428 (2003) (Kennedy, J., concurring); *Strickland*, 556 U.S. at 10-13, 15-16, 20-21; *Shaw v. Hunt*, 517 U.S. 899, 906-08, 116 S. Ct. 1894, 135 L. Ed. 2d 207 (1996); *Emison*, 507 U.S. at 40-41; *De Grandy*, 512 U.S. at 1016 (majority), 1028-29 (Kennedy, J., concurring in part and concurring in the judgment); *Cooper v. Harris*, 581 U.S. 285, 292, 137 S. Ct. 1455, 197 L. Ed. 2d 837 (2017); *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189-90, 137 S. Ct. 788, 197 L. Ed. 2d 85 (2017); *LULAC*, 548 U.S. at 446 (plurality portion); *Abrams v. Johnson*, 521 U.S. 74, 85-86, 117 S. Ct. 1925, 138 L. Ed. 2d 285 (1997); *United States v. Hays*, 515 U.S. 737, 744-45, 115 S. Ct. 2431, 132 L. Ed. 2d 635 (1995).

36

*Portugal et al. v. Franklin County et al.*, No. 100999-2

Gimenez cites no case holding that the *equal protection clause* imposes the same requirement in every voting discrimination claim.

Without a doubt, the WVRA could be applied in an unconstitutional manner, and it is subject to as-applied challenges. However, Gimenez did not bring an as-applied challenge. He brought a facial challenge. As detailed above, the WVRA, on its face, does not require unconstitutional actions.

Moreover, as amici point out, "entire pages of Gimenez's argument on this point are word-for-word identical" to the briefing from a recent challenge to California's voting rights act. Br. of Law Sch. Clinics Focused on C.R. as Amici Curiae at 14 n.1. *Compare* Br. of Appellant at 37-43, *with* Appellant's Opening Br. at 3-7, 32, *Higginson v. Becerra*, No. 19-55275 (9th Cir. June 17, 2019), *and* Pet. for Writ of Cert. at 4-6, *Higginson v. Becerra*, No. 19-1199 (U.S. Apr. 2, 2020). The Ninth Circuit Court of Appeals rejected the arguments Gimenez makes here and the United States Supreme Court denied certiorari. *Higginson v. Becerra*, 786 F. App'x 705 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 2807 (2020). Gimenez does not explain why we should reach a different conclusion based on the same arguments.

Finally, even under federal law, the threshold compactness requirement applies only in the specific context of a vote *dilution* claim. It does not apply to all voting rights cases. As the United States Supreme Court has explained:

37

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> The reason that a minority group making such a [vote dilution] challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.

*Gingles*, 478 U.S. at 50 n.17.

The WVRA protects voters from all forms of abridgment, not just dilution. Gimenez does not explain why a group must demonstrate compactness to prove that their voting rights have been abridged by, for instance, the discriminatory administration of literacy tests. *See Mexican-Am. Fed'n*, 299 F. Supp. 587. Thus, even if the equal protection clause does require a threshold compactness inquiry for a vote dilution claim, that would not make the WVRA facially unconstitutional. At most, the WVRA would be unconstitutional as applied in the context of vote dilution claims. Gimenez did not bring an as-applied challenge.

Gimenez argues that he cannot be required to prove that the WVRA is unconstitutional in all of its potential applications "because it is impossible to explore and describe every possible circumstance" that might arise. Reply Br. of Appellant at 9. However, that is the standard that applies to a facial constitutional challenge in accordance with this court's controlling precedent. *Woods*, 197 Wn.2d at 240. Gimenez does not show that our precedent is "'incorrect and harmful'" or that its "'legal underpinnings'" have changed. *State v. Otton*, 185

Wn.2d 673, 678, 374 P.3d 1108 (2016) (quoting *In re Rts. to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970); *W.G. Clark Constr. Co. v. Pac. Nw. Reg'l Council of Carpenters*, 180 Wn.2d 54, 66, 322 P.3d 1207 (2014)).

Therefore, because it is impossible for Gimenez to show that the WVRA is unconstitutional in all of its potential applications, his facial equal protection challenge to the WVRA must be rejected.

E.      We decline to reach the additional issues raised by the plaintiffs and amici

As detailed above, each of Gimenez's arguments fails on its merits.  We affirm the trial court on that basis alone.  We therefore decline to reach the alternative arguments raised by the plaintiffs and amici concerning RCW 7.24.110 and Gimenez's standing to appeal.[18]

F.      We award the plaintiffs' request for attorney fees and costs against Gimenez and remand for a calculation of fees incurred at the trial court

Finally, the plaintiffs request attorney fees and costs based on the WVRA, as well as the statutes and court rules governing frivolous claims.  We need not decide

---

[18] The plaintiffs and amici argue that Gimenez's constitutional claims should not be considered on their merits because Gimenez did not serve his pleading on the attorney general pursuant to RCW 7.24.110.  It is undisputed that Gimenez did not serve the attorney general before filing his CR 12(c) motion for judgment on the pleadings.  Yet, arguably, Gimenez did not file any pleading seeking declaratory judgment that would be subject to RCW 7.24.110.  Gimenez attached a *proposed* pleading to his motion to intervene, which included counterclaims for declaratory judgment.  However, the trial court's order granting the motion to intervene did not address the proposed pleading, and Gimenez did not subsequently file his proposed pleading as a separate document.  Instead, he chose to file a CR 12(c) motion for judgment on the *existing* pleadings—the plaintiffs' amended complaint and the defendants' answer.  We decline to interpret RCW 7.24.110 as applied to these specific facts.

whether Gimenez's claims are frivolous. Instead, we award the plaintiffs' request for fees against Gimenez pursuant to the WVRA.

The WVRA allows, but does not require, an award of "reasonable attorneys' fees, all nonattorney fee costs as defined by RCW 4.84.010, and all reasonable expert witness fees" to "the prevailing plaintiff or plaintiffs, other than the state or political subdivision thereof." RCW 29A.92.130(1). Here, the plaintiffs are the prevailing parties, they are not the state or a political subdivision, and Gimenez's appeal forced the plaintiffs to spend an entire year litigating this case *after* Franklin County settled their WVRA claim. We therefore exercise our discretion to award the plaintiffs' request for fees and costs attributable to their litigation against Gimenez.[19]

The plaintiffs request their appellate attorney fees, as well as "a fee award at trial" for the "time and expense incurred litigating with Gimenez." Br. of Resp'ts at 52 & n.16. The WVRA's fee provision is explicitly discretionary, providing that "the court *may* allow" fees to a prevailing, nongovernmental plaintiff. RCW 29A.92.130(1) (emphasis added). Thus, we grant both trial and appellate fees, but we remand the calculation of trial court fees to the trial court's discretion.

---

[19] The plaintiffs were already awarded fees attributable to their litigation with Franklin County and its board of commissioners in the parties' settlement agreement.

*Portugal et al. v. Franklin County et al.*, No. 100999-2

1.     The WVRA's fee provision is constitutional

Gimenez argues that we cannot assess fees against him because "it is unconstitutional to permit a group of lawyers who are funded by another state's government[20] to collect fees from an individual Washington Hispanic citizen because of his exercise of his fundamental right to access the state courts and petition the government." Reply Br. of Appellant at 26. However, he misrepresents the authorities he cites to support this argument.

Gimenez relies primarily on *Miller v. Bonta*, No. 22cv1446-BEN, 2022 WL 17811114 (S.D. Cal. 2022) (court order). According to Gimenez, *Miller* considered "a California punitive fee-shifting provision such as this one that Plaintiffs seek to exercise" in this case, and "the California attorney general refused to even defend such a statute." Reply Br. of Appellant at 26. In fact, the statute in *Miller* was nothing like the fee provision in the WVRA.

The fee-shifting statute in *Miller* "applie[d] only to cases challenging firearm restrictions." 2022 WL 17811114, at *1. The statute "insulate[d] laws from judicial review by permitting fee awards in favor of the government, tilting the table in the government's favor, and making a plaintiff's attorney jointly and severally liable for fee awards." *Id.* The statute also provided that "[a]s a matter

---

[20] Some, but not all, of the plaintiffs' attorneys are affiliated with the UCLA (University of California, Los Angeles) Voting Rights Project.

41

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

of law, a California plaintiff cannot be a prevailing party." *Id.* The WVRA, by contrast, allows prevailing plaintiffs to recover fees, but only if they are *not* the government. RCW 29A.92.130(1). Moreover, the WVRA does not "tilt the table" in favor of any government entity, and it does not automatically make any party's attorney jointly and severally liable for fees. *Miller* simply does not apply here.

Gimenez also suggests that applying the WVRA's fee provision in this case would violate *Boddie v. Connecticut*, 401 U.S. 371, 91 S. Ct. 780, 28 L. Ed. 2d 113 (1971). *Boddie* struck down "state procedures for the commencement of litigation, including requirements for payment of court fees and costs for service of process, that restrict[ed the appellants'] access to the courts in their effort to bring an action for divorce." *Id.* at 372. The WVRA's prevailing party fee provision applies at the conclusion of an action, not its commencement. *Boddie* does not apply.

2.      We decline to assess fees against Commissioner Didier

Finally, the plaintiffs argue that "Commissioner Didier, who is a named party in the suit in their official capacity, should also be held responsible for any fee award where he was in cahoots with Gimenez's action designed to torpedo the WVRA settlement." Br. of Resp'ts at 54-55. We decline to assess fees against Commissioner Didier.

To be sure, there is significant evidence in the record supporting the plaintiffs' factual allegations. Initially, Commissioner Didier planned to intervene

in his personal capacity to challenge the validity of the WVRA. However, after the plaintiffs questioned how a named defendant could also be an intervenor, Gimenez intervened instead. Gimenez has at all times been represented by the same attorney who had originally intended to represent Commissioner Didier in his personal capacity.

Thus, the plaintiffs may be correct that "Commissioner Didier's involvement in Gimenez's intervention was transparent to all those involved in the matter." *Id.* at 55. Indeed, the trial court's order denying Gimenez's CR 12(c) motion begins by stating, "This matter came before the court for hearing on December 13, 2021 on Intervenor, *Clint Didier's*, Motion for Judgment on the Pleadings." CP at 678 (emphasis added). However, that appears to be a typo, not a finding of fact. The plaintiffs do not cite any trial court findings that Commissioner Didier is the real party behind Gimenez's intervention or appeal.

This court is not a fact-finding court. Moreover, the plaintiffs settled their claims with the defendants, including Commissioner Didier, and Commissioner Didier has not filed anything on appeal. We therefore decline to assess fees against Commissioner Didier based on the plaintiffs' allegations. We express no opinion as to whether Gimenez may have viable claims against Commissioner Didier or anyone else arising from this litigation.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

CONCLUSION

All of Gimenez's arguments are based on his interpretation of the WVRA's definition of a protected class. His interpretation is incorrect. We therefore affirm the trial court, award attorney fees and costs to the plaintiffs against Gimenez, and remand for a calculation of fees incurred at the trial court.

_____
Yu, J.

WE CONCUR:

_____
González, C.J.

_____
Stephens, J.

_____
Johnson, J.

_____
Gordon McCloud, J.

_____
Madsen, J.

_____
Montoya-Lewis, J.

_____
Owens, J.

_____
Judge, J.P.T.

44